**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-cr-119 (ABJ)** |
| **JAMES MCNAMARA** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James McNamara to 27 months of incarceration, which is the middle of the guideline range—24 to 30 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

## I.    INTRODUCTION

The defendant, James McNamara, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

McNamara joined the violent mob storming the Capitol, travelled from the Lower West Terrace to the Upper West Terrace with the mob, and then engaged in violence on the north side of the Capitol Building. As police were removing rioters who had unlawfully entered the building, McNamara charged up the stairs on the north side of the building, violently lunged toward the officers, and swung at a Metropolitan Police Department ("MPD") Officer with a closed fist. McNamara then grabbed a metal barricade and repeatedly slammed it against the North Doors of the Capitol Building that officers were attempting to secure. A few minutes later, McNamara attempted to enter the Capitol through the North Doors and was repelled by pepper spray and rubber bullets. About 30 minutes later, McNamara, standing near the front of the mob up against a police line near the North Doors, motioned to the mob of rioters gathered behind him to rush the Capitol Building. In a voluntary interview prior to his arrest, McNamara falsely claimed that he did not witness or participate in any violence on January 6, 2021. He changed his story only after being confronted with video showing his violent actions that day.

The government recommends that the Court sentence McNamara to 27 months of incarceration, which is the mid-point within the advisory Guidelines' range of 24 to 30 months, for McNamara's conviction under 18 U.S.C. § 111(a)(1). A 27-month sentence reflects the gravity of McNamara's criminal conduct and takes into account his admission of guilt.

---

Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 32 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     James McNamara's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, McNamara traveled from his residence in Chicago, Illinois to Washington, D.C. to attend the former president's "Stop the Steal" rally. ECF 32 ¶ 8. After attending the rally, McNamara walked to the U.S. Capitol with a crowd of people. *Id*. ¶ 9. Images 1-2, below, are open-source photographs of McNamara in Washington D.C. on January 6, 2021 prior to his arrival at the Capitol Building.[2]

---

[2] The government will submit clips of the relevant videos to the Court by USAfx prior to the sentencing hearing.



*Image 1: McNamara holding an "I Matter" Sign*



*Image 2: McNamara walking to the Capitol*

When McNamara arrived at the U.S. Capitol, a large group of rioters had assembled on the grounds surrounding the Capitol Building. ECF 32 ¶ 10. He saw that the building was closed to the public and law enforcement officers were actively attempting to keep the crowd from entering the building. *Id*. McNamara made his way from the Lower West Terrace to the Upper West Terrace, and then walked to the north side of the building. *Id*. ¶ 11.

On the north side, McNamara saw rioters attempting to gain access to the building through the North Doors near the Senate Chamber. *Id*. At approximately 3:13 p.m., he saw rioters being forcibly removed from the Capitol Building through the North Doors by police. *Id*. ¶ 12. McNamara climbed the stairs outside of the North Doors and violently lunged toward the police officers removing rioters from the building. When he lunged, McNamara swung at MPD Officer G.P. with a clinched fist *Id*. Images 3-4, below, are open-source and body worn camera images of McNamara lunging toward police outside of the North Doors.



*Image 3: Video Exhibit 1 at 00:22*



*Image 4: Video Exhibit 2 at 00:02*

Immediately after the assault, police attempted to secure the building by closing the North Doors, which consist of two sets of two doors on the interior and exterior of the building with an approximately 10-to-15-foot vestibule area in between. ECF 32 ¶ 13. While police were attempting to close the outer set of doors, a struggle ensued as rioters actively resisted police by holding the outer doors open. *Id*. When police managed to close one of the outer doors, McNamara picked up a large, metal bicycle rack barricade that was lying near the outer doors and began repeatedly ramming it into the closed outer door.[3]   *Id*. McNamara rammed the door with the barricade at least four times while police on the other side were still actively attempting to close the other outer door that rioters had kept open in the struggle. *Id*. Images 5-6, below, are open-source and bodycam images of McNamara ramming the Capitol door with the metal barricade.



*Image 5*

---

[3] Online sleuths labeled McNamara with the moniker #RailMixer prior to his identification in this case due to his repeated ramming of the doors with the metal barricade.



*Image 6: Video Exhibit 3 at 1:19*

A short time later, the police successfully closed both of the outer North Doors. ECF 32 ¶

13. A few minutes later, as McNamara looked on, rioters again pulled open one of the outer doors

and attempted to remove the door from its hinges or otherwise damage it. *Id*. ¶ 14. About a minute

later, McNamara watched as rioters successfully pulled both outer doors open. *Id*. McNamara then

entered the vestibule area between the two sets of North Doors. *Id*. Police repelled McNamara's

attempt to enter the building by shooting him with rubber bullets and pepper spray. *Id*. Image 7,

below, is an open-source image of McNamara being sprayed with pepper spray after entering the

vestibule area of the North doors.



*Image 7: Video Exhibit 3 at 3:46*

After temporarily retreating from the North Doors, McNamara reappeared on video at approximately 3:42 p.m. when a there was a stand-off between police and rioters, including McNamara, just outside the North Doors and just prior to a bear spray attack at 3:49 p.m. that forced the police back inside the building. McNamara can be seen on the police officer's body camera footage at 3:42 p.m. urging rioters to charge forward toward the police line and preparing for violence by turning his cap backward, covering his face with a bandana, and putting on gloves. Image 8, below, is a screenshot from the footage.



*Image 8: McNamara motioning to mob to charge toward Capitol – Video Exhibit 4 at 1:07*

### McNamara's Statements to the FBI

On July 1, 2022, an FBI Special Agent interviewed McNamara at his attorneys' office in Chicago, Illinois. McNamara admitted to being at the Capitol on January 6, 2021 but claimed early in the interview that the protest was peaceful with people chanting, and it was not an angry mob. He also claimed that he never went into the Capitol building, never touched, or scuffled with a police officer, and that while he was near the North Doors, the crowd never became violent.

Later in the interview, the FBI showed McNamara photos and videos of his violent conduct

at the Capitol. After seeing the videos, McNamara claimed that the police use of tear gas had caused him difficulty breathing and watering eyes, which made him angry.   McNamara claimed he picked up the metal barricade and repeatedly struck the door to the Capitol because he thought he was being "attacked." He admitted that he knew there were police officers near and behind the door as he attacked it. When asked why he picked up the barricade, he stated something to the effect of, "I started throwing a fit I guess."

## III.    THE CHARGES AND PLEA AGREEMENT

McNamara was arrested on November 30, 2022 after a criminal complaint was filed charging him with seven criminal violations related to the Capitol riot. ECF 1, 5. On April 7, 2023, a single-count criminal Information was filed charging McNamara with assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1). ECF 25. On May 8, 2023, McNamara pleaded guilty to that criminal Information pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

James McNamara now faces sentencing on a single count of violating 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, McNamara faces up to eight years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The Probation Office calculated the combined offense level of the count of conviction as 17, as set forth below.

Count One: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| **Total Offense Level:** | | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Adjusted Offense Level:** | | **17** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated McNamara's criminal history as category I, which the government does not dispute. PSR ¶ 47. Accordingly, based on the government's calculation of McNamara's total adjusted offense level of 17 after acceptance of responsibility, McNamara's Guidelines imprisonment range is 24 to 30 months. PSR ¶ 110.

---

[4] U.S.S.G. § 2A2.2(a) applies because, as the plea agreement sets forth, the assault was an "aggravated assault" based on McNamara's intent to commit another felony, 18 U.S.C. § 231(a)(3) (civil disorder).

McNamara's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's calculations. ECF 31 at 2-4.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, McNamara's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. McNamara charged up the Capitol steps and lunged at police attempting to remove rioters from the Capitol building. He then grabbed a large, metal barricade and rammed it repeatedly into the doors of the building and near police attempting to secure the entryway. A few minutes later, McNamara attempted to enter the building and had to be repelled by rubber bullets and pepper spray. Later on, police body camera footage captured McNamara continuing to encourage rioters to charge toward police and the building. The nature and circumstances of McNamara's offenses[5] were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' incarceration.

### B.  The History and Characteristics of the Defendant

McNamara is 62 years old and the owner and operator of a residential water heater repair

---

[5] While McNamara is being sentenced only on a violation of 18 U.S.C. § 111(a), he has also admitted to all the elements of 18 U.S.C. § 231, which is relevant conduct. *See* ECF 32 ¶ 15.

and installation company. He has a complicated criminal history with a significant number of arrests related to substance abuse and anger issues. PSR ¶¶ 49-61. He has three criminal convictions on his record, including a firearms offense in 2001, but is in Criminal History Category I.  His history and characteristics, including a history of arrest for assaults, weigh in favor of a term of incarceration in the middle of the guideline range.

    **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McNamara's criminal conduct on January 6, particularly his violent ramming of a door while police fought to secure it and protect the Capitol, was the embodiment of disrespect for the law.

    **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration. McNamara was the antithesis of a peaceful protestor on January 6, 2021. He assaulted police, encouraged the mob, and used a metal barricade to intentionally damage the United States Capitol building, the single most prominent symbol of this Nation's democracy. When interviewed by the FBI, McNamara was initially untruthful and claimed that the protest at the Capitol was peaceful, and even when directly confronted with video evidence of his violent conduct, he attempted to minimize it, blaming the police. To date, McNamara has expressed no remorse for his actions on January 6.

McNamara's conduct on January 6 combined with his significant history of arrest for violence and theft indicate a lack of respect for the law and highlight the need for a sentence that will specifically deter McNamara from further criminal conduct.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *U.S. v. Richardson*, No. 21-cr-721 (CKK), a defendant convicted of the same offense as McNamara, 18 U.S.C. § 111(a)(1), was sentenced to a government-recommended term of incarceration of 46 months after using a metal pole to strike a police officer three times, stopping only when the metal pole broke in his hands. Moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers. Like McNamara in this case, Richardson was pepper sprayed at least two times, and he struggled in a post-January 6 FBI interview to acknowledge his contributions to the violent attack and the serious impact his actions had on the law enforcement officers present that day. Richardson received more incarceration than the 27-month term recommended in this case, but Richardson engaged in far more assaultive conduct during the riot.

The defendant in *U.S. v. Clayton*, No. 22-cr-139 (RCL) was also convicted of 18 U.S.C. § 111(a)(1). Clayton received a 30-month sentence of incarceration after he verbally harassed police officers on the Upper West Terrace, grabbed one officer's shield, and stole another officer's baton. Later in the riot, Clayton grabbed and pulled on an officer's police shield before slinking back into the crowd. He flaunted the stolen police baton next to a police line, and when police attempted to retrieve it, Clayton shoved an officer in the head and grabbed his face mask. When interviewed by

the FBI, Clayton, like McNamara in this case, was dishonest about his role on January 6, claiming he did not riot or engage in violence.

In *U.S. v. Creek*, No. 21-cr-645 (DLF), the defendant pushed through barriers, grabbed an officer, drove him backward forcefully several feet, and hit him in the face shield of his helmet. Creek then shoved another officer in the shoulders, and then kicked him, causing the officer to fall backward to the ground. Creek then threw what looked like a ratchet strap—a thick strap with heavy metal buckles—in the direction of officers. Creek was convicted of 18 U.S.C. § 111(a)(1), and the Court imposed the government-recommended sentence of 27 months' incarceration. Like *Creek*, the government is recommending a middle-of-the-guidelines sentence on McNamara's conviction for the same offense of conviction.

Other Judges in this District have imposed middle of the guideline sentences in January 6 officer assault cases. Cody Mattice and James Mault both pleaded guilty to 18 U.S.C. § 111(a) and were sentenced to 44 months incarceration based on a Sentencing Guidelines Range of 37 to 46 months. *See U.S. v. Mattice, et al.*, 21-cr-657 (BAH).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

19

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer G.P., did not suffer bodily injury as a result of McNamara's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that McNamara must pay $2,000 in restitution, which reflects in part the role McNamara played in the riot on January 6.[9] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) McNamara's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 13.

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, which is the middle of the guideline range calculated by the Probation Office, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: */s/ Andrew J. Tessman*
 ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 3rd day of August, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:     */s/ Andrew J. Tessman*_____
          ANDREW J. TESSMAN
          Assistant United States Attorney
          District of Columbia – Detailee
          West Virginia Bar No. 13734
          300 Virginia Street
          Charleston, WV 25301
          (304) 345-2200
          Andrew.Tessman@usdoj.gov

22